So we're ready to proceed with the next case on our docket, which is United States of America v. Gilbert Carrasco. That has been submitted on the briefs, and that takes us to the last case on our calendar today, Ashley Judd v. Harvey Weinstein. So if counsel are ready to proceed, you may begin. Thank you, Your Honor. May it please the Court, Theodore J. Boutrous, Jr. representing Plaintiff Ashley Judd, it's good to see you all. I'd like to reserve three minutes for rebuttal. This case presents an important issue of first impression, whether California Civil Code Section 51.9, which prohibits sexual harassment in business, service, or professional relationships, provides Ms. Judd, an actor, with a remedy to redress quid pro quo sexual harassment and retaliation by Harvey Weinstein. With the time of the events in question, he was the most formidable and acclaimed and powerful film producer in Hollywood. The answer is yes. The statute applies. Its plain language makes clear that it applies broadly to sexual harassment in business or professional relationships. And as the California Supreme Court has articulated, the statute is intended to apply to harassment that occurs outside the workplace, which is exactly what happened here. Indeed. Can I, because your time is, our time is limited here. Yes. I'd like to ask you, it seems like you're arguing that Section 51.9 unambiguously covers all business, service, or professional relationships without being limited to the ones listed in the statute. But I guess I want to explore here, or argument, subpart F and how that should be or could be interpreted as having a limited effect on the scope of the statute. How do you reconcile subpart F with your view of the statute? You know, I would start with the fact that the provision is, the examples are led in by the including but not limited to language. So we need to give that effect. And then when we get in the Supreme Court of the United States in the Ali case, this court in the Peng gang case, California Supreme Courts take the same approach and recognize that a legislature can specify examples in an abundance of caution and to remove any doubt that certain things or here activities are covered by the statute and create the presumption that those activities are covered. Subsection F gives another presumption that professions and businesses and services like those listed also get sort of a boost in terms of the interpretive approach. But that cannot take away from the broad language of the statute, business, service, or professional relationships. And these are just relationships that are including but not limited to. And it would make the language of the opening paragraph redundant and surplusage if we only look at the examples and things that are substantially similar. I do think, Your Honor, we meet that test as well because the strand that we think you see among the examples is a power relationship, a leverage that here Mr. Weinstein had over Ms. Judd in these sorts of relationships. It's the classic power relationship that was abused here. And if you look at the examples, they're examples of situations where the person who's discriminating has a power relationship and the ability to abuse it, to sexually harass the plaintiff. So, Mr. Butrus, I read it. I'm not sure I read the statute the same way you do. But let me ask you if this is what you mean. And I'll just tell you both for the benefit of both counsel. I read it, I think, to say all business and professional relationships. The legislature was talking about recognizing that this kind of harassment doesn't just occur between coworkers in-house, if you will. So, all business and professional relationships with this particular characteristic. They still have to have this particular characteristic by my read of the statute. You're describing this as a power differential. I wonder if, for me, perhaps a little bit more precise definition about this common characteristic that must be present is the ability to coerce. You used the word leverage. If I think of it as all business and professional relationships that have that characteristic, is that what you mean? That's certainly one interpretation that we believe is correct. It's that coercive. The person who's discriminating has the power to either give something or hold it back. And in sexual harassment law, Your Honor, as this court knows, that's one of the defining features. It's an abuse of power. And I think that coercion is another way to put what we were saying by the power relationship. Okay. So, if that's right, forgive me for interrupting. But we see this clock ticking. Yes. So, then I imagine that the relationship might not just be dependent upon a job title. So, if you would, this hypothetical, I'm thinking I have two, and I'm going to try to run them by quickly. But I think it could change. If I were looking for an apartment or a house and engaging a realtor, I am free to walk away, it seems to me. But not so much if I put down a deposit or an earnest money or if I sign an exclusive listing agreement that has some kind of penalty provision. So, it strikes me. I just want to, again, for the benefit of both counsels, it seems to me that that relationship could morph depending upon facts and circumstances. That's one of our points, Your Honor, that there is a fact analysis here. And the district judge dismissed this as a matter of law at the motion to dismiss stage where we've alleged that this was a longstanding, ongoing professional relationship where Ms. Judd couldn't sever her ties with Harvey Weinstein at that time. He was the gateway towards professional success for actors. And the SAG-AFTRA brief makes this point very well, that it could severely have damaged Ms. Judd's career. So, it was the kind of relationship that, in the language of the statute at the time, that was not easy to terminate. And that language was taken out in the 2018 amendment to make it even easier to bring these claims. But I think you've put your finger on it, Your Honor, that it's a fact-dependent issue. And here, the general meetings that Ms. Judd attended, which she thought was attending at the Peninsula Hotel, that turned into the discrimination and the retaliation, those are the essence of much of what goes on in the film industry. And the SAG talks about this, Ms. Judd alleges it in detail in the complaint. This was her seeking to advance her career as an independent businesswoman. And instead, Mr. Weinstein discriminated against her, harassed her, she spurned his advances, and then he retaliated. And then he kept lording that over her. And that kind of goes, Judge Kristen, to your point. She couldn't just say, Harvey Weinstein, I've had it with you. He was still the overlord of the film industry. And he kept kind of bringing this deal, this mock deal up when she would see him in other circumstances. So if this isn't covered by a statute that broadly speaks of professional and business relationships, and one of the biggest industries in California with a history of abuse by people in power with respect to young actors, sexual, taking advantage of people in a sexual way, then it would make no sense. The statute was meant to protect people. And that's why I don't think that – yes, Judge Stein. Mr. Boutros, you say clearly this is encompassed. There was a later amendment that makes it clear to me at least that this would be encompassed by the statute, correct? Yes, that's right, Your Honor. Now, if that's so, and their relationship is now unambiguously covered by this statute, let me go back to your very beginning. Why is this a case of general importance and wide-ranging impact? I'm going back, but I'm also going forward, because in my mind, it goes to the issue of whether or not they should be certified if it is indeed an ambiguous statute, as of the commenced – that is, the 1996 statute. So speak to both of those. Thank you, Your Honor. First, the legislature did say that it wanted to clarify that a director and a producer and other persons were covered all along, and so it articulated it expressly to create that presumption that I mentioned. Right, so the question is, then, why did you start, when you did, of saying how important this case is, when it may not be important now, given the new amendment? Yes, Your Honor, well, it's certainly important to Ms. Judd, because under the district court's interpretation, she would be deprived of the protection of this statute. No question, you're absolutely correct, and these things are important to every single litigator, and I really not only say that, but I believe it in each of the parties. But in terms – because, again, I'm thinking of certification. Yes. Go ahead. Yes, Your Honor, thank you, and I think it's an excellent question. The district court noted that there are other women who, in this period, that began really in October 2017, and Ms. Judd was one of the first women who came out and went on the public record and revealed Mr. Weinstein's longstanding wrongdoing. And at that point, she learned, when Peter Jackson did an interview, that Mr. Weinstein had retaliated against her. So she didn't know she had a retaliation claim until then, and we believe that there are other women in the union representing actors and media artists. SAG-AFTRA agrees with us that there may well be many other women who find themselves in a similar position. They now realize and learn that their careers were being short-circuited, their business careers, their professional careers, because they had spurned improper sexual advances and were being retaliated against. So we believe there's another group out there of individuals who would be deprived of protection of this statute unless it is interpreted the way we believe it should be. And I should say, Your Honor, on this clarification point, because I did want to get to that, the legislature acted in the wake of Ms. Judd's revelations and the revelations from all of the other women who came forward about Mr. Weinstein and others. And at the time the legislation was passed, Mr. Weinstein was arguing in this case that this statute didn't apply. And that's the kind of circumstance that the California Supreme Court and the Carter case that the California Senate cites, the Western Security Bank, where there's a controversy, Mr. Weinstein, the legislature weighs in and says, we want to clarify, we want to be specific. Did they say they wanted to clarify as opposed to modify? They did, Your Honor. In fact, the California Senate brief cites at least four different places in the House, the Assembly committee analysis, the floor analysis, the Senate committee analysis, and floor analysis. They said this clarifies existing law. In another place they say it almost certainly clarifies existing law. So it's really the classic circumstance. And that Carter case that the California Senate cite really, I think, captures it. This was the legislature saying, we want to make clear. This has always applied, but we're going to put it in the statute to make clear. So we think that either way, if we apply the 2018 bill, it's not retroactive because it's just clarifying. And I go back to the original language. The district judge found that the plain language, common sense, common language of the statute does indicate that the statute does apply. Judge McGee, it looks like you might have a question. So with that, you've given us, you've pointed us here today in your briefing to what the California legislature has done, and you said it's clarifying. And so I'm just trying to figure out, so how does that affect our analysis? I mean, do we use that to say, oh, it was unambiguous? Or do we say, oh, even if it was ambiguous at one time, now we can say it's no longer ambiguous? I'm just trying to figure out how do we apply that. Your Honor, I would propose that as the district court, as I was saying, found that the common sense understanding, the plain language of a business and professional relationship would capture clearly, based on that plain language, the relationship between Ms. Judd, an actor and a producer, and she was in a movie before and movies after their relationship, and he kept haunting her with this encounter in their relationship at professional functions. So I would say that the prior version of the statute, on its face, captures and covers this relationship. Then the legislature has reinforced that by saying we want to clarify and put it in the statute, and that's like the sort of coup de grace that says this statute applies. It's meant to protect individuals outside the workplace that are subjected to retaliation and discriminated against. I had one other question. It seems the district court relied somewhat on the preamble. Can you address that, please? Yes, Your Honor. It's the uncodified preamble that was originally put in by the Senate early on in the process, and it was not included in the statute. The California courts, federal courts are very clear that a preamble, for whatever it's worth, it's true as far as it goes that the legislature was concerned about professional service provider and client relationships, but as the drafting process went forward, it was broadened to cover business, service, or professional relationships. That uncodified preamble can't defeat and nullify the express language of the statute, and the cases are very clear on that, and it would be counter to just basic principles of statutory construction. So we don't think that the preamble has any effect on interpreting the statute. Again, it's not inaccurate, but it doesn't purport to say this is the only thing we're going to cover in the statute, and if I could reserve a couple minutes for rebuttal, that would be wonderful. I'll give you a few minutes. Thank you, Your Honor. Yes, go ahead.  Ms. Cooperstein, you're muted. I think you need to unmute your screen. There should be a button on the top of your screen on the right-hand side that looks like a microphone. I am not. If you touch your screen. There you go. Thank you. There you go. Now you turn it off again. I'm sorry. May it please the Court, good morning, Your Honors. I'm Phyllis Cooperstein on behalf of the appellee, Harvey Weinstein. I'd like to start with the last question that Judge Morgia raised about the 1994 preamble. I think it's ironic that an appellant is arguing that the 1994 preamble, which states that the concern or intent of the legislation then was to cover certain professional relationships between certain persons and their clients, has no effect on how the Court interprets the statute as it existed in 1996-1997, but we should give great credence to a 2018 legislative analysis opinion about what the 1994 legislature intended. California law in the McClung case says that a legislative declaration of an existing statute's meaning, quote, is but a factor for a court to consider and is neither binding nor conclusive in construing the statute. What about the plain language of the original statute, please? I've advanced, I've pushed back a little bit, I think. I'm not sure if I did or not, on Mr. Boutros' expression. I don't read it as all business and professional relationships. Maybe it is or is not what he meant, but I'm asking you, why shouldn't we read the statute to include all business and professional relationships that have this particular characteristic? I think he's describing it as a power differential or leverage. I think of it as the ability to coerce, maybe that's leverage. Why shouldn't we construe the original statute that way? Your Honor, Apollon has argued and did in the opening brief, I mean there was a heading that said the statute was not limited to the enumerated relationships or even those that were substantially similar and argued that it was any or all business, service, or professional relationships. And that was at 27 to 28. Well, of course, because the statute says including. Take me a minute, but I will get to that. I hope to answer all parts of your question. So, that interpretation reads in the words any and all. And it reads out the words may exist and subsection F substantially similar. The cases that this judge relies on, particularly the Ali case. In that case, the Supreme Court was interpreting a statute and it had an exemption applicable to quote any officer of customs or excise or any other law enforcement officer. Now, our case, we have the complete opposite. The words any and all are not in the statute. Secondly, the court in Ali rejected the argument that quote any other law enforcement officer, close quote, should be limited to officers quote of the same nature as customs officers and excise officers. Again, we have the inverse because here our statute does have language of limitation because it requires application only to those who are substantially similar to those that are enumerated in the statute. So, trying to read out the limitations also causes a problem of interpretation because the including but not limited to language. Plaintiff is arguing essentially that how we determine whether or not a relationship is covered is by looking at whether there was harassing conduct. I mean, was there some coercive conduct to try to get the plaintiff to either submit to sexual harassment or not or be retaliated against or we're supposed to look at whether the relationship existed at the time or we're supposed to look at whether or not it was a relationship that was not easily terminated. Now, that would be a complete lack of notice to most people in the state of California as to whether or not they were in a relationship that was governed by section 51.9. Your time is ticking and I really don't think this answers my question at all. So, I guess you'll use your time the way you want it, but I did have a different question. Just to remind you, my question is why shouldn't we read the statute to include business and professional relationships that have this particular common element characteristic? In all instances, we won't see that common element and I think that's part of the problem. One of the examples that have been disputed with us is when we talked about the parent down the street who does carpool. Now, you wouldn't think that somebody providing carpool service for your child, another parent, would be one of the relationships covered. But, what if you're a single parent, you can't do carpool, you depend on that other parent and that other parent now is trying to coerce you into a sexual relationship? That's not a business or professional relationship. I'm sure, I'm confident that would be the response to that particular example. So, it doesn't strike me as helpful. I am just talking about the universe of business or professional relationships that have this similarity. The district court thought that it would, I think he said folly. He really couldn't see a similar characteristic between the enumerated examples. What I'm positing is, I think there is. And, we'd just like to have you push back to help me check this theory I have. To me, a common example, particularly because we're talking about a statute that addresses sexual harassment, the particular characteristic is the ability to coerce. Mr. Boutros is using the word leverage in order to coerce someone, I guess, into tolerating unacceptable offensive behavior. That's my question for you. Why shouldn't we interpret it that way? Because if we're going to interpret it that way, then we have to examine, you know, is there a potential for coercion in any given relationship? And, how do you determine ahead of time whether or not there's a potential for coercion in the relationship? I think that's right. You'd have to allege, and this is why it goes to a fact question. I've even suggested that an enumerated example, if we go occupation by occupation, that may or may not qualify, right? A realtor, I'd be free to walk away from a realtor. And, the original statute talked about the ability to leave the relationship. But, maybe not so much if I put down a big earnest money or signed an exclusive agreement that has a penalty provision. It seems to me it would be up to the plaintiff to allege those facts, for sure. But, it doesn't go back to, it seems to me that there is a reading of the statute. You know, my read seems pretty clear without resorting to any legislative history at all. I want to give you a chance to respond. Maybe you have, but if you'd like a response, I wanted to give you fair notice. That's my read. Well, I think the problem is that, well, certainly we have enumerated in the statute real estate appraiser. So, the statute would seem to apply whether or not you had put down a deposit. So, you can't say, it cannot easily terminate as a separate element of the statute. So, whether or not you can easily terminate can't determine whether or not it's one of the covered relationships. I think that's what's reading too much into it. Well, I get, I mean, for a realtor, I mean, a realtor is trying to find a home for you, I guess. And here, Mr. Weinstein was, I mean, was placing actors into roles. I mean, you can draw, it just depends on how narrow, how broad you want to read this. And so, I wanted to ask you, why is Ms. Judd and Mr. Weinstein, their relationship not substantially similar to the people in the statute or the individuals listed in the statute? What's your best argument for that? Our best argument is that, simply, the statute has to put you on notice of whether or not you're in a covered relationship. It cannot be the case that someone who clearly is not in a substantially similar, and what makes it substantially similar? I think that gets back to, is it the coercive element or is it not? But can we say that a teacher is substantially similar to a real estate appraiser or a doctor? We would have a difference of opinion on that. Now, we could look at the case where there was a certified nursing assistant who was deemed, the court determined, was substantially similar to a physician. But not in all cases. It had to be looked at factually because that would not automatically be covered. So, it's not merely the provision of a professional service. But that, again, begs the question here, what professional service was Mr. Weinstein providing? I have a question about that. Is there a difference between what I understand? The briefing describes this thing called a general meeting in this different industry where I have not worked. What's the difference between a general meeting in that film industry and an informational interview offered by a law firm? Again, hypothetical. An informational interview offered by a law firm that says, because of this COVID-19 virus, we're not hiring right now. But we'd like to interview your top-notch law clerks as an informational interview. Would there be a difference? I don't see what the difference is. I also don't see what the difference would be if your neighbor's child asked one of you for some career advice, which law school should I go to or what area of law might I be interested in practicing in or what firm should I look at for somebody who is already in law school? Does that create a professional relationship? Certainly, perhaps down the line, you may be able to write a letter of recommendation or make some kind of recommendations or make a call to get somebody an interview. But does that create a professional relationship? Isn't there very much a difference? And again, just as Judge Christen said, I don't really know this industry, but apparently, according to the papers, personal relationships are extremely important. I don't think there's any question that he was a major player in the industry at the time. And I would think it would be reasonable for her to think and therefore be on notice that this man held substantial sway over her career. Am I wrong there? Well, that would be true then of any director, producer, other influential actor, investor. Any one of those persons could potentially have some sway or maybe even a lot of sway over her career. It's not even potential. He had sway as perceived by her and as perceived by him, I take it, as well. It seems to me another way to get at this is that the person asking across the driveway doesn't have an existing relationship. Maybe one of my law clerks going to an information interview doesn't have an existing relationship either. In the facts of this case, Ms. Judd has alleged that she did have a pre-existing professional relationship with Mr. Weinstein. So, it seems to me that in this case, it's probably stronger on the facts than my hypothetical. Do you want to speak to that? It's not just a list of job titles. It's also a professional relationship. So, I understand. But in this case, what we have is that, yes, she worked on a film that his company produced a year or two earlier. But she also alleges she had no interaction with him when she did work on that. Now, that professional relationship ends when the movie is finished and completed and released. She alleges nothing else between that and the time of the hotel encounter. She saw him at industry events, etc. Excuse me for interrupting. I beg your pardon. But she does allege one other thing, and I've gone around and around about what to do about this fact. She alleges that, well, I guess Mr. Jackson alleges that what Mr. Weinstein said is that she's a nightmare to work with. Not that she's a bad person or an unreasonable person, but specifically called upon a prior working relationship to un-recommend her for this very important role. What about that? Again, I don't think that transforms this into an existing relationship at the time of the encounter, because that statement was made after, allegedly made after the encounter. And it could have been said, would it have as much impact if he said, my brother has told me that she's a nightmare to work with. So whether it's based on his personal knowledge, allegedly, or not, I don't see how that tells you back in the hotel encounter, are they in an existing relationship at that time? Well, my point is, I think you might be missing that. Maybe my question wasn't very articulate. It probably wasn't. But what I mean is, according to her allegations, he's hearkening back to and calling upon a prior working relationship in order to provide a very negative recommendation. Does that affect our analysis here? I don't see how it does, because the relationship has to be existing at the time of the harassment. Your position is that was bookended. That's over. That's over. I see. All right. Thank you. Ms. Kupferstein, can you talk to me about the effect of the clarifying, or if you would call it a clarifying statute or modification of the statute? What's your view on that? Our view on that is that California law is quite explicit that unless a statute or amendment states that it is retroactive, it is not. There's no such retroactivity language in the amendment. What we have is a legislative analyst's opinion in 2018 as to what the 1994 and 1996 legislatures intended. That is very much, it may be of interest, but it is not at all binding or conclusive on the court as to what it was the earlier legislature intended. Judge McGee, may I ask one other question? Sure, certainly. The question I have for both colleagues, because we defer to state Supreme Courts heavily, and whatever we rule here, of course, we could be trumped by the state Supreme Court. But the circumstances in this case make me concerned about statute of limitations. So if there's other people out there, and I don't know if there are, but certification is not a short process. It often takes years. And so if other people are similarly situated where they now have recognition or acknowledgement that they were perhaps a victim of this kind of coercive behavior, and they've put two and two together, particularly if someone like Mr. Jackson has come forward or they have heard from other people about these experiences, it seems to me like the defendant is going to have a pretty persuasive argument that that clock is now running in some of those cases. So the question is, if the clock is running, and we have this district court opinion that if we certify it would be in limbo, it seems to me that that would be a reason for us to go forward and get a ruling so that people know what their rights are and can move forward, lest we create some chaos here in the interim. Again, perhaps not a very well-articulated question, but I am concerned about that timing, so I wanted to have a chance for you to respond. Thank you, Your Honor. I also want to address, in part, Judge Stein's earlier question as well. This isn't a case that is important beyond Ms. Judd, because we have the 2018 amendment, which now clarifies that anyone who has been harassed in that kind of relationship since 2018 is covered. You're talking about whether or not there are cases that might have been brought for conduct prior to 2018. I'm not aware of any cases alleging coverage under the statute brought against Mr. Weinstein for any conduct of his prior to 2018. You would expect that, given that the allegations by Ms. Judd and many, many others came out in 2017, that the discovery rule would be such that the claims would be time-barred, because they've had more than two years in which to have brought such an action. So it doesn't seem that your decision here would have any great impact either way on anyone other than Ms. Judd and Mr. Weinstein in this particular case. Well, I gather that we don't know that one way or the other. Mr. Boutros seems to think there are scads of people in that category, and you're saying you doubt it, but we don't have anything to go on, correct? I would assume that Mr. Boutros would have cited us to the dockets of all the cases that have been brought under Section 51.9 since the general allegations were being made public against Mr. Weinstein, and we haven't seen any. I don't have anything further, Judge McGee. I just wanted to clarify, my question didn't go to outstanding allegations limited to this particular defendant, just for both counsel's clarification, but thank you for your indulgence. Okay. Thank you, Ms. Kupferstein. Mr. Boutros, Ms. Kupferstein went three minutes and 40 seconds over her time, so I'll give you three minutes and 40 seconds if you need it. Thank you very much, Your Honor. Let me start with Judge Christin's question, because I do think our preferences for this court could decide. Let me have Blanka set the clock here real quick. Oh, sure. Blanka, can you set the clock for three minutes and 40 seconds? That's fine, Blanka. We'll just go with that. I'll take three. Thank you very much. I'll start with Judge Christin's point, because I do think our preference is for this court to decide this issue, because the certification process and with the world as it is, everything is sort of paused, and we think that based on the statutory language as it existed before the amendment, plus the clarification and the points that we've been discussing in the court, this court is amply able to decide the question in reverse. I want to go back to this question of coercion. Mr. Weinstein knew. He didn't need any more notice. He knew what he was doing was wrong. He knew that he had the power to coerce. The complaint alleges, and it's well known, his modus operandi was to abuse his authority to be the gatekeeper, to be the ticket to fame and an Academy Award. As Judge Christin points out, this relationship wasn't over. He wasn't a neighbor or a newspaper boy when he told Peter Jackson and Fran Walsh that Ms. Judd was a nightmare to work with and that he had a bad experience. It was about casting what became one of the most profitable and successful movie franchises of all time. That was in the context, and the retaliation is the core of our claim, because that was what Ms. Judd learned of in December 2017. On this business, on the general meetings, the SAG brief really walks through this and talks about how these meetings are different than, say, an informational meeting with a law student, because here, this was a specific invitation from Mr. Weinstein to talk about her career. Actors are independent business people, so it's an ongoing relationship for everything. Those sort of general meetings can provide the launching pad for production deals, future acting positions with that person or with others. It's clearly the kind of professional relationship that should qualify under the statute. With respect to the coercion, because it's difficult to terminate in particular here, the SAG brief makes the point that it was extremely dangerous for an actor to terminate their relationship with Mr. Weinstein. On page 13, they say, Refusing to engage with a powerful gatekeeper, let alone reporting his impropriety, could put an actor's career in jeopardy, if not ruin it entirely. I would just maybe end with two things. Ms. Judd's allegations in the ER at 64-67 and 76-77 talk about these general meetings, how they're integral to business relationships. And then finally, Ms. Kupferstein mentioned the McQuown case about clarifying legislation. That case states the exact rule we're talking about, that there's deference, and some degree of deference. It's not binding on the court when a legislature clarifies. But there, the California Supreme Court had issued a definitive opinion on an issue, and the legislature overruled it. The court said that's different. But where there's a controversy, which there was here, and the legislature steps in and even filed an amicus brief, I think that's entitled to some weight and some deference. And the district court really kind of gave it the back of the hand, and that was inconsistent with California law. So for all these reasons, we request that the court reverse. This is at the motion-to-dismiss stage. I think that this ruling does have a chilling effect, Judge Kristen, on other women who think, oh, well, this statute doesn't apply. I'm not going to go forward. So an expeditious ruling, and we greatly appreciate the court going forward with the argument, indicating that, yes, these relationships do on their face qualify, and then the case can go forward on the facts, and we greatly appreciate it and request the court reverse. Thank you. Let me just ask if any of the other judges have any further questions before we conclude. Judge Stein? I'm fine. Thank you. Thank you. Thank you all, both Mr. Boudreaux and Ms. Kupperstein, for your oral argument presentations here today. Very much appreciate it. We're sorry they had to occur remotely, but we appreciate them very much nonetheless. The case of Ashley Judd versus Harvey Weinstein is now submitted, and that concludes our docket for this morning. Thank you all. Thank you. Thank you. Richard? This court for this session stands adjourned.
judges: Murguia, Christen, Stein